UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 4:11-cr-37 |
| v. | ) | |
| | ) | *Mattice / Lee* |
| | ) | |
| MARIO PULE | ) | |

## REPORT AND RECOMMENDATION

Before the Court is a motion to suppress statements made and evidence seized during the execution of a search warrant at the residence of Defendant Mario Pule ("Defendant") on September 29, 2010 [Doc. 12].[1] Defendant argues the search warrant was not properly executed because the police searched his separate bedroom even though his roommate was the only tenant of the residence who was referenced in, and a target of, the search warrant. Defendant also argues his statements to police during the execution of the search warrant should be suppressed because he was subjected to custodial interrogation without the benefit of warnings given pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In addition, Defendant argues that even if he was not subjected to custodial interrogation, his statements were not made knowingly and voluntarily given the totality of the circumstances. After considering the evidence and arguments, I **FIND** no constitutional violation and I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

**I.  FACTS**

Defendant was indicted on charges he unlawfully possessed a firearm and ammunition on September 29, 2010, because he was both an illegal alien and an individual convicted of a

---

[1] Defendant's motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 13]. The Government filed a response in opposition [Doc. 15]. After the evidentiary hearing was held on June 21, 2012, post-hearing briefs were timely submitted by the parties [Docs. 21 & 22].

misdemeanor crime of domestic violence [Doc. 1]. At the evidentiary hearing on Defendant's motion to suppress, held June 21, 2012, the Government offered the testimony of Shelbyville Police Department ("SPD") Sergeant Brian Crews ("Crews") and, in rebuttal, the testimony of Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent Stephen Gordy ("Gordy"). Defendant testified on his own behalf. Crews' version of events differs significantly from the version presented by Defendant. As relevant, the witnesses testified as follows:

### A. Crews' Testimony

Crews has been employed with the SPD for twelve years and has been a sergeant in the criminal investigation division for approximately three years. In 2010, he began a narcotics investigation of Bernardo Liborio ("Liborio"), who was suspected of selling cocaine.[2] As part of his investigation, Crews obtained a search warrant (Exhibit 1)[3] for Liborio's residence located at 2106 Midland Road in Shelbyville, Tennessee, which is one-half of a duplex.[4] At the time of the search, Liborio shared the residence with several roommates, including Benedicto Ortiz ("Benedicto"), who occupied one bedroom, and Defendant, the leaseholder, who occupied another bedroom. Liborio occupied the third bedroom of the three-bedroom residence.

Liborio was the named focus of the search warrant. There is no mention of Defendant in the search warrant or application. Crews only learned of Defendant's name when he determined the utilities at Liborio's residence were listed in Defendant's name.

---

[2] Liborio was later convicted of drug distribution in state court as a result of the investigation. There is no evidence Defendant was involved in the drug distribution activities of Liborio and no drugs were found in the search of the residence.

[3] All references to exhibits refer to documents entered into evidence during the hearing.

[4] The other half of the duplex was not searched and is not involved in this matter.

2

Crews and three other law enforcement officers executed the search warrant, which authorized a search of the residence for drug-related evidence, on September 29, 2010. When they began the search, they already knew Liborio was not present as he had been taken into custody, away from the scene, pursuant to a traffic stop.

Crews recalled it was not a "high anxiety" search, because Liborio was already in custody. Crews and the other three officers knocked on the door of the residence and Defendant answered the door. The officers advised Defendant they were there to execute a search warrant concerning Liborio, not him. The officers asked Defendant to sit on the living room couch after they searched it for weapons, and he did so.

Benedicto was in the shower with the bathroom door locked upon the arrival of the search team. Two officers knocked on the bathroom door and advised Benedicto to put clothes on and come out. They were anxious to get him out of the bathroom and, when he did not respond right away, the two officers expressed a "sense of urgency" to get him out of the locked bathroom. There was some anxiety on the officers' part until Benedicto exited the bathroom. Crews does not recall another roommate being present.

Once Benedicto was out of the bathroom, the officers began searching the residence for cocaine while Defendant and Benedicto were seated in the living room. Some of the officers present were in plainclothes and some were in uniform. One officer was standing at the door to the living room to secure the scene and watch Defendant and Benedicto. The remaining officers conducted the search. Crews could not recall a fifth officer at the search with a drug dog, but he admitted it was possible since a drug dog was used during the traffic stop of Liborio.

The residence was approximately 1,000 square feet, composed of one common bathroom,

one common kitchen, one common living room, and three bedrooms along a common hallway. Crews did not recall asking Defendant about which room belonged to which roommate. Instead, Crews determined who occupied each bedroom based on the documents found in the bedrooms. During the execution of the search warrant, Crews viewed Defendant as just a roommate because Crews had no information Defendant was involved in any sort of drug activity. Thus, his interaction with Defendant was non-confrontational. Defendant was never restrained and he was not "questioned." Crews told Defendant that the search related to Liborio, not Defendant.

Crews searched Liborio's bedroom and found cash, but not drugs. Crews did not expect to find firearms in the house based on his investigation, but explained it is common to find firearms during a drug investigation. Crews could not recall asking Defendant as to the whereabouts of drugs or guns. Crews did not hear any other officers asking Defendant questions.

While Crews searched Liborio's room, other officers searched Defendant's bedroom and discovered a fake social security card and two fake resident cards. Officers also found a handgun and a long gun. The officers who searched Defendant's bedroom brought the discovery of the firearms to Crews' attention by calling Crews into the bedroom to observe the firearms. Crews never asked Defendant if the guns in his room were his and instead assumed they were Defendant's guns because they were located in Defendant's bedroom.

Crews' primary concern upon discovery of the firearms and documents was to determine if it was possible for an illegal alien to legally possess firearms. Crews assumed Defendant was illegally in the county based on the fake documentation. To obtain information about a possible illegal alien in possession of firearms, Crews contacted a SPD lieutenant who advised Crews that an illegal alien could not lawfully purchase a firearm, and Crews decided to seize the firearms and

4

fake documents.

Defendant overheard the officers' discussion about the firearms and voluntarily interjected that he purchased the handgun legally in a gun shop in Tullahoma, Tennessee. Crews responded by informing Defendant that if he purchased the gun using false identification, it was a fraudulent transaction. Crews believed Defendant interjected to convince the officers that the firearms were purchased legally.

In the Incident Report prepared the day of the search (Exhibit 3), Crews stated he asked Defendant if he was in the United States legally and Defendant responded, "No." At the evidentiary hearing, however, Crews could not recall asking Defendant about his legal status. Instead, he remembered making an assumption that Defendant was in the United States illegally based on the fake documents found in Defendant's bedroom.

Crews did not advise Defendant of his *Miranda* rights because Defendant was not the target of the narcotics investigation and Crews did not intend to take Defendant into custody that night.[5] Crews told Defendant that if there was no problem with the firearms, Defendant could get them back. Crews tried to make Defendant feel comfortable that the officers were not "taking him away." Crews intended to, and did, seize the weapons and fake documents to provide to ATF so ATF could investigate the Tullahoma store that sold the firearm(s) to Defendant.

Crews described a very non-confrontational atmosphere during all of his interactions with Defendant. All of his interactions with Defendant were conducted in English, with little difficulty, and none of the officers spoke Spanish. Toward the end of the search, a guitar was noticed in the

---

[5] Indeed, Defendant was not arrested and charged with possession of the guns until more than a year later [Doc. 1].

5

living room, and Crews asked who played the guitar. Defendant said it was his and played the guitar while he and Crews "cut up about that" for a few minutes.

During the entire event, Defendant and Benedicto were not restrained. Crews would have permitted Defendant and Benedicto to leave at anytime during the search, so long as they were first searched for officer safety reasons and to prevent the removal of any evidence. Defendant and Benedicto, however, never asked to leave or even indicated they wanted to leave. If they had left the residence, the officers would not have let them back in until the search was concluded for officer safety reasons. The purpose of the officer at the front door was to secure the scene and watch Defendant and his roommate while they were present, not to prevent them from leaving.

Although Crews did not advise Defendant of his *Miranda* rights, after the motion to suppress was filed he initially claimed to Gordy that he had advised Defendant of his *Miranda* rights and questioned him about the firearms. He made this statement in an email to Gordy on May 16, 2012 (Exhibit 2). Once Crews reviewed his file, however, he realized his mistake and immediately advised Gordy that he, in fact, had not advised Defendant of his *Miranda* rights or questioned him about the firearms.

### B. Defendant's Testimony

Defendant testified that he did not answer the door for the police officers. When the police arrived, Defendant did not even know they were inside his residence "right away." Defendant was in his bedroom and when he came out, he heard noise at the door and the police entered. Defendant thought his "other companion" had perhaps opened the door for the officers, but his companion was not there. A police officer asked Defendant if Liborio lived there, and Defendant answered, "Yes." The officer did not ask Defendant to do anything at that time.

6

Another police officer went to the locked door of the bathroom where Benedicto was bathing and began urgently knocking on the door, "as if he wanted to knock it down." Defendant got scared, and asked what was going on. Crews asked where Liborio was and Defendant said he did not know. The police officer kept knocking on the bathroom door as if he wanted to knock it down. It took Benedicto "a little while" to come out of the bathroom and, when Benedicto came out, he also "did not know what was going on." Once Benedicto came out of the bathroom, officers told him to get dressed and told Defendant and Benedicto to move into a corner of the living room where there was an armchair. The officers did not tell Defendant and Benedicto they could leave.

Crews asked Defendant which bedroom was Liborio's and Defendant told him. A drug dog was then deployed to Liborio's room. Five police officers were present the day of the search: one guarding the front door, which opened into the living room, two accompanying the drug dog during the search, one walking around, and Crews. All of the officers were in "regular clothing" and had weapons. Defendant believed that he and Benedicto were going to be arrested and that they could not leave. They were not told they would be arrested, but Defendant "feared" being arrested.

After the officers searched Liborio's room, Crews informed Defendant that he was going to search all of the rooms in the house. Crews asked Defendant if there were drugs or firearms in the rooms. Defendant responded that he had a weapon in his bedroom "because [Crews] asked" and because he "didn't want any problems." Crews asked where the weapon was, so Defendant took Crews to his bedroom and showed him the gun he kept underneath his mattress. Crews again asked Defendant where Liborio might be, but Crews did not ask any other questions about the gun. After the gun was retrieved, one of the officers took Defendant to where Benedicto was sitting in the corner, and asked him to sit there. The officers did not speak to Benedicto, as Benedicto could not

7

speak English.

Defendant did not feel like he could tell the officers he did not want to talk to them because he was "frightened" they "would all be taken away because of [Liborio's] fault." Defendant later testified he did not know Liborio was engaged in drug trafficking. He just knew, from Crews, that Liborio had a lot of "problems," but he did not know what those problems were. Crews never told Defendant he had a right to speak or not to speak. Defendant did not believe he could ask to leave because there was a police officer "guarding" the door.

Defendant testified he remembered purchasing his handgun from a Tullahoma gun shop in 2002, but he did not fill out a form for the purchase. An individual selling the firearm filled out a form and a friend translated questions from English to Spanish (and vice-versa) for Defendant because Defendant could not speak English in 2002. The gun salesman did not speak Spanish. Defendant said he was not asked a question about his citizenship during the transaction. His friend translated from the salesman a question about whether Defendant was a resident of Tennessee, not whether he was a United States citizen. Defendant testified he did not recall signing the form, and he disclaimed the signature on the form.

While there was a guitar in his apartment, Defendant does not play the guitar, and he did not play it on the day of the search. Benedicto (and Defendant's other "companion") knew how to play the guitar. Defendant testified that he understood English only "a little" and not a whole lot.

**C.     Agent Gordy**

Gordy testified in rebuttal about the Firearms Transaction Record form (the "form") (Exhibit 5), which was completed in the name of Defendant in August of 2002 for the purchase of the handgun found in his bedroom. When individuals legally purchase a firearm, they complete this

8

form and the Tennessee Bureau of Investigation performs an instant background check. The completed form states Defendant is a citizen of the United States.[6]

## II. ANALYSIS

Defendant seeks suppression of the evidence located in his bedroom, claiming he has an expectation of privacy in his personal bedroom. Defendant also seeks suppression of his statements concerning the location of guns in his bedroom and his admission of possession of the guns. Each of Defendant's arguments for suppression will be addressed, in turn, below.

### A. Search of Defendant's Bedroom

Defendant's argument for suppression of the evidence found in his bedroom rests on a claim that the search warrant was improperly executed. Defendant claims the search of his separate bedroom violated the Fourth Amendment because the probable cause for the issuance of the search warrant related solely to the activities and property of Liborio–not Defendant–and he claims a reasonable expectation of privacy in his separate bedroom under the circumstances. The government responds by arguing the search warrant was both properly issued and executed.

As argued by the government, when there is reliable information that drug trafficking is being conducted at or from a residence, "there is no reason for the warrant not to authorize a search of the entire house." *United States v. Elder*, Nos. 91-5605, 91-5606, 1992 WL 42346, at *3 (6th Cir. Mar. 3, 1992). If, however, officers knew or should have known that a building contains multiple

---

[6] The date of birth on the form is listed as 1/10/79, and Defendant's birthday is 10/1/79, which Gordy considered to be cultural confusion about how to list the day and month of a birthday. Gordy also expressed his view about the similarity of the signature on the form and the signature on the fake documents. It is not necessary to consider Gordy's speculative testimony regarding such matters herein and this aspect of his testimony has been disregarded for purposes of this report and recommendation.

9

"separate dwelling units," the officers are obligated to exclude from the warrant any units for which they lack probable cause to conduct a search. *Maryland v. Garrison*, 480 U.S. 79, 84-85 (1987). Here, however, Defendant has made no argument that his bedroom should have been excluded from the warrant when it was issued, so I **FIND** the warrant was properly issued and will turn to the issue of execution of the warrant.

The Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Reed*, 141 F.3d 644, 648 (6th Cir. 1998); *see also* U.S. Const. amend. IV. In deciding whether the execution of a warrant runs afoul of the Fourth Amendment, courts are to focus "on the conduct of a reasonable officer and the reasonableness of his belief as to whether the search at issue is proceeding beyond the four corners of the warrant." *See United States v. Ritter*, 416 F.3d 256, 266 (3rd Cir. 2005) (referencing *Maryland v. Garrison*, 480 U.S. 79 (1987)).

The government relies on *United States v. Ayers*, 924 F.2d 1468 (9th Cir. 1991), wherein Ayers moved to suppress evidence resulting from a search of his bedroom pursuant to a warrant because the officers allegedly acted unreasonably in executing the warrant. Ayers argued that because the named target of the search, a former co-tenant of Ayers, no longer lived at the residence, the police had no right to execute the warrant and, even if they had a right to execute the warrant, they still had no right to search Ayers's bedroom because the target of the search had no common control over Ayers's bedroom. After addressing *Garrison*, the United States Court of Appeals for the Ninth Circuit affirmed the search of the entire residence, including Ayers's bedroom, holding:

> A search warrant for the entire premises of a single family residence is valid, notwithstanding the fact that it was issued based on information regarding the alleged illegal activities of one of several occupants of a residence. *See* 2 W. LaFave*, Search and Seizure: A*

10

> *Treatise on the Fourth Amendment*, § 4.5(b) at 219–20 (2nd ed. 1987) and the cases cited therein. In *People v. Gorg*, 157 Cal.App.2d 515, 321 P.2d 143 (1958), the California Court of Appeal considered facts similar to those before us. The California court held that a search of an entire apartment shared by three persons, including their separate bedrooms, was proper pursuant to a warrant naming only one of the tenants. *Id.* at 522–23, 321 P.2d 143. The bedroom of each tenant opened onto the common areas and was not locked. *Id.* at 523, 321 P.2d 143. The court found the apartment to be "one distinct living unit occupied by three persons" instead of "distinct living quarters occupied by different persons." *Id. See also Hemler v. Superior Court*, 44 Cal.App.3d 430, 118 Cal.Rptr. 564 (1975) (search of bedroom of person not named in the search warrant appropriate where bedroom opened onto common hallway and was not locked).

*Id.* at 1480.[7]

A similar result was reached in *United States v. Baylis*, No. 3:08-cr-147, 2010 WL 396302 (E.D. Tenn. Jan. 27, 2010) (Jordan, J.), although neither party cited it. In *Baylis*, the defendant, one of two leasees in a residence, contended the police exceeded the scope of the search warrant issued for a search of the entire residence when they searched his locked bedroom located within the residence. The Court found the bedroom was merely one room within the residence, not a separate residence. Although *Baylis* turned on this Court's finding that the police were not aware of any claim of separate residences within the home, this is a distinction without a difference as it applies here. While the testimony in this case indicates the police knew Defendant's bedroom was separate from the other two bedrooms in the sense that each tenant had his own bedroom, the evidence also demonstrates Defendant's bedroom was merely one unlocked room within the shared residence, not

---

[7] Upholding the trial court's denial of the motion to suppress, the Ninth Circuit observed that "a drug dealer's narcotics and related paraphernalia [are] likely to be found in his residence" and could be "hidden in any portion of the residence." *Id.* at 1480. "The most obvious place for the police to search would be the drug dealer's bedroom. Therefore, any other portion of the house would be a more secure hiding place." *Id.*

11

a separate dwelling unit outside the scope of the warrant.

At the hearing, no evidence was presented to indicate the individual bedroom doors within Defendant's residence were locked, or even closed, at the time of the search. Defendant's bedroom opened up to a common hallway, and Defendant shared common areas with his roommates, such as the bathroom, living room and kitchen. There is no evidence Defendant sought to preserve his bedroom as a place private to the exclusion of his roommates or others. There is also no evidence of the existence of any sort of separate exit, separate doorbell, separate mailbox, separate utilities, or other indicia of distinct living quarters occupied by different persons. Although Defendant chose to testify, he offered no testimony concerning any subjective expectation of privacy in his bedroom or any objective evidence he sought to maintain his bedroom as a separate dwelling unit.

A person aggrieved by a search and seizure has the burden of production and persuasion to suppress evidence. *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986). Defendant has not met that burden here as he has not shown the search warrant was improperly executed or that a reasonable officer would believe the search was proceeding beyond the scope of the warrant. Therefore, I **FIND** the search warrant was properly executed, including the search of Defendant's bedroom. As a result, it is not necessary to address the parties' alternative arguments.

    **B.**    **Statements**

Defendant argues his statements, made during the execution of the search warrant and without the benefit of a *Miranda* warning, both identified the location of the firearms, leading to their seizure, and revealed that he owned the firearms. Defendant seeks to suppress these statements because (1) he was not informed of his *Miranda* rights prior to making the statements; and (2) the statements allegedly were not made voluntarily. The government argues Defendant's statements were voluntary and, in addition, because Defendant was neither in custody nor interrogated,

12

*Miranda* is not implicated.

The Fifth Amendment states that a defendant cannot "be compelled in any criminal case to be a witness against himself.'" *United States v. Protsman*, 74 F. App'x 529, 532 (6th Cir. 2003) (citing U.S. Const. amend. V.). As a result, no criminal suspect may be subjected to custodial interrogation without being advised of his rights under *Miranda*. *See Miranda*, 384 U.S. at 478-79. "To ensure compliance with this rule, incriminating statements elicited during custodial interrogation prior to *Miranda* warnings cannot be admitted at trial. However, this rule only applies where there has been such a restriction on a person's freedom as to render him in custody." *United States v. Malcolm*, 435 F. App'x 417, 420 (6th Cir. 2011) (internal citations and quotation marks omitted).

As noted in *Malcolm*, custodial interrogation is questioning initiated by the police after a person has been taken into custody or is "'otherwise deprived of his freedom of action in any significant way.'" *Id.* at 420 (quoting *Miranda*, 384 U.S. at 444). Thus, to determine if an unwarned custodial interrogation has taken place, a court must determine the circumstances surrounding any interrogation; and second, under those circumstances, "would a reasonable person have felt that he was not at liberty to terminate the interrogation and leave." *Id.*

1. **Interrogation**

As recently held by the United States Court of Appeals for the Sixth Circuit,

> "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest or custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). On the other hand, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected' by the holding in *Miranda*." *Cole*, 315 F.3d at 636 (quoting *Miranda*, 384 U.S. at 478).

13

*United States v. Collins*, ___ F.3d ___, 2012 WL 2094415, at *4 (6th Cir. June 12, 2012).

The version of the events surrounding the search and seizure testified to be Crews and Defendant differs in both the significant and insignificant details. Crews and Defendant did not agree about what the officers did and said or even who played the guitar. I **FIND** Crews testified consistently and credibly that he did not interrogate Defendant about the firearms either before or after they were found. This finding is bolstered by the Incident Report, filed the day of the search, which indicates Crews only asked Defendant about his citizenship after the guns were located.[8] The Incident Report makes no mention of any questions about guns.

Defendant, on the other hand, was not fully credible in several respects. For instance, Defendant claimed only a little knowledge of English, but the evidence indicates he has been in this country since at least 2002, when he obtained the gun, and he showed comprehension of English during the hearing beyond his claim of only "a little" understanding. Crews also credibly testified Defendant understood and spoke English during the search contrary to Defendant's claims. As another example, it is unlikely that the police entered the house on their own. While Defendant denied letting them in, Crews credibly testified Defendant opened the door for the police.

After considering each witness's demeanor, appearance, mannerisms, interest, and bias, and after considering the contradictions and consistencies with other evidence, I **FIND** Crews to be credible. Thus, I **FIND** the evidence demonstrates Defendant was not subjected to interrogation about the guns and I **FIND** the officers located the guns and fake documents without assistance from Defendant. I also **FIND** Defendant voluntarily interjected that he legally purchased the guns, perhaps in the hope of avoiding trouble as he testified he wanted to avoid any problems that day.

---

[8] Defendant has not specifically sought to suppress his response to this citizenship question, and Crews admitted he could not remember whether he asked the question.

Such volunteered statements are not barred by the Fifth Amendment and their admissibility is not affected by *Miranda*. *Collins*, ___ F.3d ___, 2012 WL 2094415, at *4

While it is not strictly necessary to address custody as a result of my finding that Defendant was not interrogated, custody will be addressed below to facilitate any further review of Defendant's motion.

### 2. Custody

Even if Defendant was asked about the location of guns, as Defendant claims, I **FIND** he was not in custody. The Sixth Circuit employs a totality of the circumstances approach using a reasonable-man-in-the-suspect's-position standard when deciding whether a person is in custody. *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000); *Malcolm*, 435 F. App'x at 420. Whether a reasonable person would have felt free to leave an interrogation is only one of the factors used to determine the issue of custody. *Singleton v. Carter*, 74 F. App'x 536, 544 n. 6 (6th Cir. 2003); *Malcolm*, 435 F. App'x at 420. Other factors include "(1) the purpose of questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions." *Crossley*, 224 F.3d at 861 (quoting *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998)).

Defendant argues he was in custody because he "was told where to stand, not to leave and saw officers standing guard at the doors." [Doc. 12 at PageID #: 29]. First, Defendant did not testify he was told by officers not to leave; instead, he testified he was *not* told he *could* leave. Second,

15

even looking at Defendant's version of events, I **FIND** a reasonable man in Defendant's position would have felt free to leave.

According to Defendant's testimony, Crews asked him if there were drugs or firearms in the house and Defendant responded by telling Crews he had guns in his bedroom *because they asked and because he did not want any problems.* Crews then asked where the guns were, so Defendant took Crews to his bedroom and showed him the guns. Defendant's testimony, even if fully credited, which it is not, indicates he hoped to avoid problems via cooperation. Defendant testified he feared he and Benedicto *would be* arrested, not that they *had been* arrested.[9] Defendant was not told either that he could or could not leave the house, and, according to Crews, Defendant was reassured the police were not going to take Defendant away. Even according to Defendant, Crews repeatedly asked about Liborio, not Defendant, and Defendant's testimony indicates he understood the police were there only due to Liborio's "fault." Significantly, Defendant was not handcuffed or restrained, facts which weigh against finding he was in custody.

There is, however, some indicia of custody such as the presence of several armed officers, including one posted at the front door, a drug dog, and the failure to tell Defendant he could leave the house. Even with these factors, however, I **FIND** a reasonable person would feel free to leave. By Defendant's on testimony, he understood the police were there because of Liborio's "fault." Under the totality of the circumstances, I **FIND** Defendant was not in custody. Thus, his Fifth Amendment rights did not attach to any non-custodial questioning. Therefore, I **RECOMMEND** the motion to suppress Defendant's incriminating statements be **DENIED**.

---

[9] No questions were asked about Defendant's experience with the legal system or his knowledge of the legal system. The indictment indicates Defendant was convicted of misdemeanor crime of domestic violence on November 23, 2004 pursuant to Tennessee state law, but no evidence of this interaction with law enforcement was presented during the hearing.

16

Case 4:11-cr-00037-HSM-SKL   Document 23   Filed 07/05/12   Page 16 of 18   PageID #: 80

### 3. Voluntariness

Defendant, citing *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010), argues that even if the Court determines he was not entitled to *Miranda* warnings, as recommended here, his statements to police were not free and voluntary because his primary language is Spanish, not English, and no interpreter was used to ensure he understood his situation or the questions. It should be noted that *Al-Cholan* is not entirely on point, as it addressed custodial interrogation in the context of a voluntary waiver of *Miranda* rights. As noted above, Defendant was not subject to a custodial interrogation. However, the alleged issue of the language barrier will be briefly addressed.

A determination of the voluntariness of a defendant's confession is viewed under the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). In making these determinations, a court must consider "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation." *Id.* at 226; *United States v. Rigsby*, 943 F.2d 631, 635-36 (6th Cir. 1991) (although defendant's education was limited, he understood the nature of the waiver of his rights and his confession was therefore voluntary). Relevant factors include the defendant's age, education, and intelligence; his experience in the criminal justice system; whether the defendant was informed of his constitutional rights; the length and extent of the questioning; and the use, if any, of physical punishment. *Ledbetter v. Edwards*, 35 F.3d 1062, 1067-68 (6th Cir. 1994).

Although Defendant is familiar with English only as a second language, the evidence demonstrates he is able to understand and converse in English. In *United States v. Riascos-Suarez,* 73 F.3d 616 (6th Cir. 1996), a Spanish-speaking defendant was stopped and the police asked for his consent to search his vehicle. The defendant responded to the questions in English and did not make any indication that he did not understand the officer's questions. *Id.* at 625. The defendant later

17

claimed that he did not understand English well enough to give voluntary consent to a search. *Id.* The Sixth Circuit rejected this argument because the evidence presented at the suppression hearing "overwhelmingly" refuted his claim. *Id.* A similar result is reached here. I **FIND** Defendant exhibited a sufficient understanding of English to make a voluntary statement under the totality of the circumstances and, specifically, that Defendant's interjection about the guns in his bedroom and his acknowledgment of possession of the guns was voluntary.

### III. CONCLUSION

For the reasons stated above, I **RECOMMEND**[10] that Defendant's motion to suppress [Doc. 12] be **DENIED**.

> s/ *Susan K. Lee*
> SUSAN K. LEE
> UNITED STATES MAGISTRATE JUDGE

---

[10] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).